IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY, an Arizona corporation,<br><br>        Plaintiff.<br><br>  v.<br><br>LINDA BLAGRAVE, a Hawaii resident, individually and doing business as KAHUKU-KAI RANCH, and KAHUKU-KAI HORSES,<br><br>        Defendant. | Civil No. 05-00662 SOM/LEK<br><br>DECLARATION OF LINDA BLAGRAVE |
| LINDA BLAGRAVE, a Hawaii resident,<br><br>        Counter-Claimant,<br><br>  v.<br><br>NAUTILUS INSURANCE COMPANY, an Arizona corporation,<br><br>        Counter-Defendant. | |
| LINDA BLAGRAVE, a Hawaii resident, individually and doing business as KAHUKU-KAI RANCH, and KAHUKU-KAI HORSES,<br><br>        Defendant and<br>        Third-Party Plaintiff,<br><br>  v.<br><br>GRIFFING SWAN & LAI INSURANCE BROKERS,<br><br>        Third-Party-<br>        Defendant. | |

# DECLARATION OF LINDA BLAGRAVE

I, LINDA BLAGRAVE, declare as follows:

1. I am the named defendant in this matter.

2. I am competent to testify to the matters stated herein.

3. I make this declaration from my personal knowledge.

4. In 1996, I entered a lease with the Estate of James Campbell for approximately 10 acres of unimproved pasture land located in Kahuku.

5. I initially rented the property from Campbell Estate as a place to board and ride my own horses.

6. When I entered the lease with Campbell Estate in 1996, there was a makeshift barn on the property constructed from an old Matson shipping container. I understood this structure had been left by a prior tenant, who operated a piggery on the property. Campbell Estate also constructed fencing on the perimeter of the property, which included a front and rear gate to the property.

7. There is no water or electricity on the property, and hasn't been any during the entire time I have been a tenant.

8. During the term of my lease nobody has lived on the property, although I have kept a couple of guard dogs on the property to discourage theft.

9. During the term of the lease I have added a few improvements to the property. I have constructed some fencing to make separate paddocks for the

horses; several open shelters for the horses (consisting of telephone poles and corrugated roofing); I purchased an old storage container to use as a tack and feed room; and I installed a makeshift mounting block to assist with mounting and dismounting the horses. Most of the fencing I constructed on the property was done with salvage materials (e.g., old wood and posts) and rolled wire.

10. Beginning in approximately 1999 and continuing through 2006, I offered guided horseback trail rides for a fee at the leased property. I also boarded other horses on the property for a fee, and did some horse breeding.

11. I offered trail rides and boarding services not as a money-making venture, but did so in order to defray the costs and expenses of maintaining my own horses.

12. Under the terms of my lease with Campbell Estate, I was required to carry and maintain, at my own expense, comprehensive general liability insurance with minimum limits of $1,000,000, naming Campbell Estate as an additional insured.

13. From 1996 to 2004, I used Griffing Swan & Lai Insurance Brokers, Inc. ("GS&L") to assist me with obtaining the general liability insurance required by the lease.

14. My primary point of contact at GS&L initially was Rose Lalau.

15. It is my recollection and belief that GS&L was aware of my use of the property for equine activities. On at least one occasion Rose rode horses at my property and I believe she was also aware that I boarded horses there. To the best of my recollection and belief, Rose was also aware that I was conducting trail rides on the property after 1999.

16. As evidence of that, attached as Exhibit B-21 is a true and accurate copy of a letter from Rose Lalau to me, dated October 2, 1997. Rose sent me a copy of my insurance policy with the letter. In the letter Rose thanked me for riding my horse, Shannah, and for having been shown around my "ranch."

17. To the best of my recollection and belief, in the several insurance applications that GS&L asked me to review and sign between 1996 and 2003, the leased property was always designated as "vacant land." To the best of my recollection and belief, the same "vacant land" nomenclature was used in the actual insurance policies that were later provided to me.

18. For example, attached as Exhibit B-22 is a true and accurate copy of a renewal certificate with Colorado Western Insurance Company for the policy period October 1, 1997 to October 1, 1998. At the top of the form it indicates "NON-ASSESSABLE EQUINE RENEWAL CERTIFICATE."

19. Attached as Exhibit B-23 is a true and accurate copy of an ACORD insurance binder sent to me by Rose Lalau for the policy period from

October 1, 1997 to October 31, 1997. In the block for description of operations, the property is described as "10 Acres Pastoral (Vacant) Land Located in Kahuku, HI."

20. Attached as Exhibit B-24 is a true and accurate copy of the declarations page of my insurance policy for the period October 1, 1998 to October 1, 1999. The property is classified as "Vacant Land – Not-For-Profit."

21. I have looked for copies of my other insurance policies prior to 2003, but I have not been able to locate them. Nonetheless, it is my recollection that GS&L always described the property as "vacant land" in the applications and renewals.

22. At no time did I tell GS&L that my leased property was "vacant land." This was a term used by GS&L in the paperwork that it prepared and sent to me. I thought this was possibly an insurance term, and was used because my property did not have any permanent structures on it. I did not think it was an inappropriate description for my property.

23. On several occasions before 2003, I recall I was charged an inspection fee for my general liability insurance policy, so I assumed the insurance companies had sent someone to inspect the property.

24. In 2003, my liability insurance was due for renewal on October 1, 2003. I understood GS&L was attempting to renew my existing policy or find new coverage.

25. On or about September 29, 2003, GS&L faxed some paperwork to me at the Kahuku police station, where I was then working, regarding my insurance renewal. I recall the paperwork included an insurance application that was prepared by GS&L. Although the insurance application is dated July 9, 2003, I did not see it until late September 2003. I was asked to review the application, sign it, and return it to GS&L as soon as possible. All the information on the application form had already been typed in by GS&L. I was told the application needed to be signed in order to obtain insurance with Nautilus. A true and accurate copy of the document that I signed and returned to GS&L is attached hereto as Exhibit B-7.

26. Because my existing insurance was about to expire, I reviewed the application quickly, signed it, and sent it back to GS&L. I do not recall whether I specifically noticed that the application described the property as "vacant land," but if I did, I would not have considered this out of the ordinary because all the previous insurance policies from 1996 to 2003 used the same or a similar designation, to the best of my recollection and belief.

27. I believed all other information on the completed application was truthful and accurate.

28. It was my expectation and belief that the Nautilus insurance policy would protect me from claims made against me by other persons who were injured on my property or while participating in trail rides. It was also my belief that the waiver form that riders signed would bar them from making injury claims against me, but if the waiver form did not protect me, then I expected by liability insurance policy would protect me. I was never informed by GS&L or Nautilus that the "vacant land" designation used in the policy restricted coverage for me in any way, nor did I have that understanding or belief based on the policy provisions.

29. After Ms. Wong was injured during a horse back trail ride on October 11, 2003, I immediately reported the incident to GS&L.

30. By letter to me dated October 28, 2003, Nautilus informed me that it had hired John Mullen & Company to investigate the Wong incident. I cooperated completely with John Mullen's investigation.

31. On or about July 14, 2004, I received a written notice that my insurance policy with Nautilus would not be renewed. A true and accurate copy of that notice is attached hereto as Exhibit B-8.

32. By letter to me dated September 23, 2004, almost a year after the accident, Nautilus notified me that it had completed its investigation of the Wong

incident. In that letter to me, Nautilus asserted there was no coverage for the matter under my insurance policy with Nautilus. This was very distressing to me. A true and accurate copy of the Nautilus letter is attached hereto as Exhibit B-9.

33. In March 2005 or thereabouts, I was served with a lawsuit filed against me by Ms. Wong and Mr. Shelton. I asked Nautilus and my homeowner's insurance company, State Farm, to protect me.

34. By letter dated April 28, 2005, Nautilus informed me that it was denying me any coverage or protection under my insurance policy. A true and accurate copy of that Nautilus letter is attached hereto as Exhibit B-10.

35. I then hired Mr. Olson to help me with the insurance companies.

36. The Wong Lawsuit went to arbitration in April 2006 and resulted in the arbitration finding in favor of Wong and Shelton.

37. I was informed by James Wong, the attorney appointed by Nautilus to represent me, that Nautilus paid $61,383.09 to Wong and Shelton to settle the Wong Lawsuit, which was the amount of the arbitration award.

38. I believed it was appropriate to appeal the arbitration award, because it was my belief that I should have been protected by the liability waivers that Wong and Shelton signed, and I thought a court should determine that. It would have caused me great financial hardship to defend myself, however, and I understood Nautilus refused to continue paying for my defense.

I declare under penalty of law that the foregoing is true and correct.

DATED: Honolulu, Hawaii, October 26, 2006.

        /s/ Linda Blagrave
        LINDA BLAGRAVE